Settlegoode v. Portland Public Schools Oregon Whistleblower Act Please the Court. Charles Merton for the Plaintiff's Settlegoode. I'd like to reserve five minutes for rebuttal, at least five minutes for rebuttal. The Plaintiff's Briefs I think adequately explore the facts. What I'd like to talk to this morning are essentially three things. The Oregon Whistleblower Act, the analytical framework that the magistrate judge used to review the other claims on the defendant's motion for judgment on the law, and then finally the new trial motion. The Oregon Whistleblower Claim would be ordinarily looked at the same way the other claims would on the judgment as a matter of law, except for one interesting point, and that is the Oregon constitutional provision that no judge can review a fact found by a jury unless the judge can affirmatively state that there's no evidence, no evidence whatsoever to support the particular finding. The rule that we advocate for in our brief was applied by this circuit in Messick v. Horizon Industries, which we have cited in our brief. That case was actually more interesting than this one on that particular issue, because there the plaintiff had sued in federal court on a federal violation of the Anti-Age Discrimination Act. And on the same set of facts, also sued under the state statute, making it illegal to discriminate on the basis of age. Summary judgment was granted by the trial judge for failure because the plaintiff, according to the trial judge, failed to present evidence of pretext. In analyzing that, the Ninth Circuit reversed both of the rulings, and with respect to the Oregon claim, said Oregon law holds that there's no shifting of burden like you have under Title VII or under the federal rules, and all you need is to present a prima facie case to get to the jury. With respect to the federal claim, however, the Ninth Circuit went into the shift burden analysis because of the summary judgment motion and said there was evidence to make a jury question on that point. That procedure should have been applied here, particularly by this judge, this magistrate judge, because she had, in another case called Ryan, which is cited by both parties, she had been reversed by the district judge in Portland on that very issue, and that reversal cited the Messick decision. So we should, on the whistleblower claim, once this judge in her rulings said that the plaintiff had put on substantial evidence of a retaliatory motive in the non-renewal of the plaintiff, that should have been the end. And there should have not have ever been any balancing. That's not Oregon law. We've cited it. Your clerks can look at the Hardy decision, which both sides cite, and decide which party is at. You're now conflating the standard of review with the burden of proof. How did it go to the burden of proof? The burden of proof comes into play later on the new motion for new trial, but certainly the burden of proof. The issue you were raising about the Oregon Constitution and whether it applies in federal court, that would simply limit the degree of the level of review that a court could make once there is a jury finding. Yes. It doesn't address the question of what it is that was a proper burden of proof that plaintiff had to meet under state law. And there are separate issues, and you're just sort of running them through. It's sort of a sideways argument. The argument is there was enough evidence here of discrimination that you should not have and you should have, you could not grant a judgment as a matter of law because of that. And coincidentally, because you, the magistrate judge. You're sort of, you could win on one or you could win on the other. Win on both. Both would be sufficient. Yes, absolutely. Absolutely. You could win if you were right on the procedural point, then it doesn't really matter whether you're right on the substantive point. That's correct. The jury was instructed, jury found, and that's the end of the matter. Our position is we will not. So you lose the procedural point, then we go to the substantive point and we see whether the judge got the law right. And our position is on the judgment as a matter of law for the defense. We went on both those points. And with respect to the other claims, also on those points. You need to win on only one, right? You only need to win on either the state law or the. . . For the whistleblower, yeah. The whistleblowing claim. No, no, but I mean. . . Yeah, that's correct. You're right. You only need to win either the whistleblower statute or the Rehabilitation Act or 1983. Yeah, because burden of proof is a substantive thing for the statute. And the same damages. No, but I guess the question I think Judge Kosinski is asking is if in the end you only win on one substantive cause of action, your client ends up getting the same amount of damages. Is that correct? Except for the Section 1983 claim, which had punitive damages. Because of the punitives. But with respect to attorneys' fees and compensatory damages, are the rest of them the same? Same.  All right. Actually, the punitives were only under 1983. Yes. None of the states. Right. Oregon has a special deal. You don't get to sue entities, governmental entities, for punitive damages. On the other claims, on the substantive issue, not the procedural one, this judge, this magistrate judge, her opinion reads as if she were deciding the motion for summary judgment and focusing on this unconfroductive, unrebutted, which we say is erroneous as a factual matter. But even if she's right, even if she were right, and even if there were testimony that this woman, the plaintiff can't write a plan for a child worth a hell of beans, that doesn't at trial, at the trial level, you don't get to do it that way. This court in Costa versus some Caesar Palace or something of that nature, Desert Palace, said that that's improper. Go ahead and say it. The brilliant opinion in Costa. Superlatively brilliant. Go ahead. Go ahead and say it. It won't hurt. It won't hurt. It's too long past. Their decision puts the finger on the issue of what goes on at trial. Let's talk about Costa for a bit. Costa doesn't apply by its terms, does it? Because it's a Title VII case. Well, but I don't know. Costa has a lot of wisdom in it about McDonnell Douglas that seems to bubble over past Title VII. And we have an author here, if I remember. The author is in no better position than any of us to interpret it, and, therefore, as counsel, he can help us out. Do you think that what our opinion in Costa says about McDonnell Douglas and its inapplicability after the case is tried, do you think it translates over to our counsel? Yes. And here's the reason. I suspected you'd say that. It's not because it arose under Title VII or some other statutory discrimination claim. It's because it focuses on the difference between what has to go on at summary judgment in order to have a trial versus what goes on in every trial that is held in the United States in any of the courts of the land. And that is whether you have in a criminal case you have a purely unbiased witness that doesn't know either the prosecutor or any of the witnesses or the defendant and says, oh, I saw a defendant eight miles away from the bank robbery at the time of the robbery, and the prosecution doesn't rebut that, just argues his own or her own evidence. You don't have to come and rebut every witness and every iota of document in a trial. Jury, as instructed here correctly, free to believe anybody they want and disbelieve anyone they want. Free to you don't count the witnesses. You decide the ultimate question. Did they retaliate? And when you get to this motion for judgment, the judgment is a matter of law. We prevail on that if we have any evidence whatsoever that a reasonable jury could conclude that we win. We lose only if no reasonable juror could find for the plaintiff. Well, what bothered me when I read this opinion first was this magistrate judge said that we had presented evidence, substantial evidence of retaliatory motive leading to the discharge. And she said that under the 1983 claim, but there's only one issue, and that was retaliation. She said then they presented evidence that she was deficient. But the jury doesn't have to believe that. And in the 1983 claim, the jury specifically found in its verdict that they didn't sustain the burden of proof on their claim, notwithstanding the fact that they were in there trying to testify to that effect. This is question four, point four of the verdict form. Have any of the following defendants proved or proven by a preponderance of evidence that they would not have renewed Dr. Settlegood's contract for reasons other than Settlegood's protective speech? And they answered no, no, no. And I take it you take that and you plug it into the Whistleblower Act and into the Rehabilitation Act as well. Not only the verdict, but what I plug in is the court's finding in her opinion. But this is saying they have failed to disprove. I understand that. And the district or the magistrate judge in her 73-page opinion seems to say that this was plaintiff's affirmative word. So it was not up to them to disprove. It was up to plaintiff to prove she would have been rehired. And because she has a deficiency, she couldn't do it. So it really sort of gets down to a... For me, the verdict is a collateral point, but I cited it. It was a collateral point because I cited it because the question had been asked. My point is this. Even the magistrate judge found that the plaintiff had put on substantial evidence of retaliatory motive leading to her discharge. I think there's not anybody who now disputes that there was retaliation for protected speech. How then? I don't think there's any dispute as to retaliation for whistleblowing. I mean, the jury came back with a verdict. It was instructed. So the question now becomes what happens next, having shown that among the motives for non-annual was retaliation, or what happens next? On the motion for judgment as a matter of law, that should be sufficient to deny the motion because a jury could find if there was a retaliatory motive leading to the discharge, that was causation. I mean, the causation issue is subsumed into that finding. Well, I think we have to separate things out. In the whistleblower claim, the language that was given to jury was whether there was a substantial or a motivating factor. So you don't even have to go so far as the answer to question four. The question is, did she sustain her burden of proof with the evidence? Forget shifting around because you don't have any of that at the trial stage. But did she sustain her burden of proof, such as there's substantial evidence, to support that it was a motivating factor or a substantial factor? Isn't that the question? Our briefs lay out that evidence. But my point is why even jump there when the magistrate herself said that she had such substantial evidence? If you have substantial evidence, how could you grant a motion for judgment as a matter of law? Okay. That's the whistleblower claim we're talking about. But that analysis spreads to all the other claims also. I want to talk about the new trial issue. Well, but arguably the standard is different as to the other claims. Arguably this Oregon standard is different because of the whistleblower statute. Arguably. You might be able to prevail even if they had some other motive. Correct. If this was a contributory motive. Correct. You don't need the but for in your whistleblower statute. No but for in the whistleblower. Oregon has rejected that forever. Right. But you do need it for your 1983 claim. Going to need it for that. Well, no, no, no. Not for the 1983 substantial evidence is substantial motivation. So you need for that. It's the affirmative. What what I needed for is the Rehabilitation Act retaliation. That's the only claim that needed for 1983. Congress has modified all that. And you get. They have the affirmative burden to show they would have taken a discharge anyway. Regardless of her free speech. As I read the magistrate judge's order. And it's not entirely clear. No, it isn't. But as I read it, what I think she thought she was saying. Is that they have established they would have gotten rid of her anyway. Because she was a bad writer of IEPs. She asserts it was conclusively established she's a bad writer of IEPs. But our break points out that there's no unbiased witness said that that was the reason they fired her. The court relied on a woman by the name of Mazzarato. But that's not what that woman testified to. She said that not being able to write would be would be a sufficient reason for non-renewal. We can we claim she's biased. But even if she wasn't, she never testified that that was that she made a decision on that. Well, she said, I went along. I read. I talked to Creebo and Winthrop. I read their evaluate Winthrop's evaluations of the plaintiff. And that was the basis of my decision that she should not be renewed. She never independently evaluated that. And there is an exhibit. I will cite it only to have your clerks take a look at it. There's other IEPs in this case, surprisingly, written by other people. And there's one exhibit that the defense put in that has six IEPs by Judy Wright. And that's at E.R. 220. S.E.R. 221. Excuse me. S.E.R. 158 through 164. To the extent this court feels compelled or necessary or even helpful to do its own analysis of whether this woman can write IEPs. Four of the six IEPs at that record have statements of goals and objectives that are no more measurable than the one that the court below compared with the same other teacher, Judy Wright. So what page did you say? S.E.R. 158 through. 158. Through 164. Through 164. And mine is letter. Linda Owens' letter. First page is a handwritten letter. And the next document's pages are individualized education program goals, short-term objectives. The first page is our client in handwriting that I could barely read. The other handwriting is. E.R. going to page 158. I'm sorry, what is it again, 158? Beginning at 158, going through 164. Oh, yes, okay. Okay, you've got about a minute left. I've got a minute. I want to save it. Okay. We'll hear from opposing counsel. May it please the court. Bruce Campbell representing the Appalese, Portland Public Schools, Susan Winthrop and Robert Clevo. The court asked the question whether there were different standards that applied to different claims, and the answer is yes. And I'd like to spend just a minute going through those. Counsel for the appellant has argued that the test in Oregon is not the but-for test. It's a substantial factor test, and that's not a correct statement. The district court applied the Hardy v. Legacy Health Systems case, and that case clearly says that the but-for test is the test for causation under Oregon law. That case is found at 167 ORAP 425, and the statement is made at page. They say it's dicta on the fact that they applied the substantial factor test. Your Honor, that's not correct. It's not dicta. It was central to the court's holding that the defendant had failed to show a disputed issue or that there was no disputed issue of fact on summary judgment. But the big argument that they make is that the jury was instructed whether it was a substantial or motivating factor. I don't know if that's right or wrong, but that's what they were instructed. I do not read that as a correct statement of Oregon law. Did you object to that? I do not know if that was the objection. I don't know if you were the trial counsel. I was not the trial counsel. Because I'm looking at what the jury was asked to decide, and I'm looking at the whistleblower at claim, and they're told to march through two things, that she disclosed information that she thought was evidence of a violation of state or federal law, and two, that that disclosure was a substantial or a motivating factor. So it seems to me that's what we have to benchmark against at this point. Well, I can leap ahead to my next point on that. Okay. I mean, do you disagree that that's what we're benchmarking against is the jury instruction that doesn't seem to have been challenged on appeal by any party? No, Your Honor. I think what we – the appropriate – Objected to at trial? I mean – I think the appropriate benchmark here is the analysis that the court used in analyzing the FRCP 50 motions. Why? Why is that? Well, because that's the basis upon which the – So this leaves the jury, and then you apply different law on Rule 50? I haven't heard this. Okay. Maybe I'd better jump ahead, and I think I can help to answer that question. Earlier this year – Well, I'm not sure what jump ahead means. Well, this court – Do you disagree with Judge McEwen that that's how the jury was instructed? I don't disagree with that. Frankly, I have to admit I don't know. Do you disagree with – Well, you don't know what? I don't know what the instruction was. Well, I just read it to you. Okay. The jury instruction is following flows of evidence. So, you know, I spent a lot of time at this case maybe taking unwittingly – accepting the jury instructions, which hadn't been challenged. And now you're coming in and arguing a whole different thing. So you can't – I mean, the case has tried – But the settlement does not have to prove that her protected speech activity was the only reason for the non-renewal decision. It's sufficient if she proves that her disclosure, or what I call protected speech, was a determinative consideration that made a difference in the non-renewal. That's what the jury was instructed. Then the magistrate judge comes along and applies a different standard than the Rule 50 motion. Well, that's what I was – I was hoping to jump ahead. The point is I don't think it makes a difference. Based on what this court has said very recently in the case of OSTAD versus Oregon Health Sciences University, which is 327 F3rd 876, this court said earlier this year that we – Excuse me. Did you sign that in your brief? No, we did not. I did not, Your Honor. No supplemental letter? No, I just came across this case in the last day or two. You should file a 28-day letter and send copies to all of us in the court. Did you tell opposing counsel you were going to rely on it? No, I did not. I just looked at it yesterday for the first time. And like 24 hours ago? Yes. Do you own a fax? I'm sorry? Do you own a fax? I was – I do own a fax, but I was – Do you have a telephone? Yes. Did you know how to get a hold of opposing counsel? How is he going to respond to this? I suppose – I don't know. There's a possibility of filing a memorandum of additional authorities. We also have a system where if you come up with something in the 25 seconds before argument, we have a little piece of paper, and the clerk can give you that, and it would help me if you would write out that citation at the conclusion of the argument just so we'll all have it. Okay. Now tell us why it wouldn't make any difference. Because what the court says – what this court says is that they cite a case called Knickerbocker, and they said, In Knickerbocker, we held that protected activities are a substantial factor where the adverse actions would not have been taken but for the protected activities. So the court has essentially said – What does that have to do with the question we're asking? That there is no material difference between substantial factor and but-for causation. That's what this court has said earlier this year. Now – Interpreting Oregon law? No, this is an interpreting – I believe that this is a Title VII case. Well, but that's the whole point, is we had already talked about Title VII being different than whistleblowers. Well, getting back, though, to the Oregon law – Do you have any Oregon case that says it's not a substantial or motivated factor versus but-for? I do. The case – the Hardy case that the district court relied on and that we cited in our brief, Hardy says that it's a but-for test, and – I saw that, but once again, that's not how the jury was instructed, right? As I've been – as I've learned today, that's correct. Let me ask you a different question, because I don't think you want to go any further on this one. Why was the immunity claim not submitted to the jury? How do you, after the jury comes back with a verdict, raise an immunity issue? Because qualified immunity, as I understand it, is a legal determination – the court can make the – or the jury can make the threshold factual determinations, but the question of whether the law is sufficiently clearly established to preclude a finding of qualified immunity is one for the trial judge to make. Oh, I don't know. I mean, you – there's lots of cases that say you can sometimes get it decided before trial, but if you get to trial with it and you have not otherwise resolved it, why isn't this exactly an issue that you would submit to the jury? There's a fifth circuit case with a name of Snyder v. Trepanier, a 1998 case that says exactly that. If you haven't resolved it before that, you go to the jury, 142, 3rd, 791. I'm – since this was something that your clients needed to have determined in their favor, I'm just wondering why you didn't – I mean, you didn't present it to the jury. It's gone, isn't it? No, I don't believe so, Your Honor. It's not something that is to be presented to the jury. It could be raised on – and typically is by way of summary judgment. If you have, if you can raise it with summary judgment, if you do raise it, then we look and see whether or not you can resolve it with summary judgment. But you now got to trial and you want to claim immunity, but you haven't presented the issue. I don't understand how you can raise by post-trial motion something that should have been presented to the jury or wasn't presented to the jury. There are all sorts of issues that you have to decide in order to resolve the qualified immunity claim in a First Amendment case. Now, arguably, the jury did decide it because they were asked all sorts of questions about instructions. They were instructed on the substantive 1983 claim. They were told they were supposed to balance the harm to the district and so on. So arguably, they did make the underlying factual finding. But insofar as more facts were needed, well, more findings were needed. Haven't you waived that? No, Your Honor. It's not – there's a two-step determination. First is the balancing of the Pickering balancing test. And that is a test for the jury. But the trial court here assumed that a constitution – there was a constitutional violation, but she held, given the facts in the case and the significant evidence of actual disruption, that there was no – it was – the law was not sufficiently clearly established. It's not one of those – as this Court has said, one of those rare cases. Yeah, that's where I have a little bit of problem, and I don't think our cases are too clear, admittedly, on the point you just made. I mean, since Saussure, I think you're absolutely correct that it would be a legal question as to whether the law was clearly established. That is, assuming we had the right facts in which we were going to make that determination. So what concerned me was that the judge, in doing that analysis, was sort of kind of looping back on the facts that the jury had already found against your client. And I don't know exactly where the dividing line is, but what, in your view – I mean, if the judge needs to determine whether the law was clearly established, how would you frame the law that the judge is benchmarking against? If the judge needs to determine whether the law was clearly established, I think what the judge needs to do is to – based on the – look at the jury's findings, look at the evidence in its totality, and make the determination whether it was – I tried to reconcile this Court's cases. And the best I could come up with is say that it seems that the common thread is that where you have instances of actual disruption in the workplace, that the Court has been willing to find that qualified immunity is not abrogated. Okay. Let's look at what the jury – how the jury was instructed in the 1983 claim. Okay. It says, when determining whether Dr. Settlegood's – and I'm reading now from page 1539 of the transcript. When determining whether Dr. Settlegood's interest in speaking on issues of public concern outweighed the school district's legitimate interest, you may consider the following factors. Number one, whether Dr. Settlegood's protected speech impeded the school district's abilities to perform its duties efficiently. Number two, the manner, time, place of her protected speech. And three, the context. Okay. And then it says, because some anger or unhappiness necessarily accompanies speech on issues of public concern, the defendant must prove that the school district suffered an actual injury to its legitimate interest beyond mere disruption of the workplace. So the jury gets given these instructions, and it finds for plaintiff. Don't we have to infer, for purposes of all further discussion, including qualified immunity, assuming you survive – I still don't understand why you didn't submit it to the jury, why you don't just lose on that issue for that – but we have to assume that the jury found all of these points in her favor, that found that it did not impede school district's ability to perform its duties efficiently, that the time, place, and the manner was appropriate, the context was appropriate, and that there was no actual injury beyond Bruce's feelings. Your Honor, the jury did not make all of those findings. Those were factors that the jury determined in making the finding that there was a constitutional violation. But if the rule is – Well, yes, but in order to find the constitutional violation, it must resolve the balance of those factors. That's correct. In favor of the plaintiff. If you wanted more, if you wanted to have them determine issues of immunity, specific to immunity, you could have asked the judge to submit that to the jury. But we have to assume that the jury resolved these factors in her favor. Can the district court then come along and say, no, I'm going to resolve them differently? Yeah, absolutely. The district court is not resolving them differently. There are two steps. I mean, under the analysis that you just posited, it eliminates the second step. It's saying once you find a constitutional violation, game over, end of inquiry, there is no qualified immunity. And the Rudabush case says you have to – the plaintiff must establish not only a violation of a constitutional right. The Rudabush case? Rudabush. That was a post-trial case? That was cited – I mean, I think Rudabush doesn't change the law. Rudabush, I'm somewhat familiar with that one, too. That was a trial case. But the second step is that a reasonable official would understand that what he is doing violates that right. And that's the question that the trial judge makes. And in this case, the district court concluded that the plaintiffs had not met the second step. Well, in that, it says here that defendants must prove the district suffered an actual injury beyond mere disruption of the workplace. So if we assume that defendants didn't prove that because otherwise the verdict wouldn't come out like it did, what the district judge is left with is a clear constitutional violation found by the jury and a factual determination that there was an actual injury to the school district, that there may be some disruption. So why hasn't that been clearly established, that everybody knows that if you blow the whistle or if you complain, somebody's going to be unhappy and you're going to tick off some of your colleagues, etc.? I don't see why, when you combine that plus the jury findings, you can't say that your client didn't meet the clearly – that it wasn't clearly established. Because, Your Honor, the jury in balancing the employee's right to free speech against the disruption in the workplace, the jury may well have determined that there was a lot of disruption, but that the free speech rights were just enough stronger, you know, 51 percent stronger than the 49 of the actual disruption. So the scale may have tipped ever so slightly, which would be enough to establish the constitutional violation. But then the next level of inquiry, then, is for the district court to determine, is that clearly established based on the facts of this case? Is the constitutional violation so clearly established as to preclude qualified immunity? So if we have to make that based on this record, and it would be a de novo, so we don't really need to look at what the trial judge did here, why wouldn't, in this case, it be clearly established that simply because you're irritated at somebody and you don't like them complaining, you can't discharge them? Why isn't that clearly established law from way back, including Bruce Jarrell? Well, I mean, I think it requires a look at the evidence and its totality. And there was – Ms. Suttlegood was – What was it? People had their nose out of joint, which usually happens when somebody writes a letter saying that they're doing a job badly. But what was the disruption? Your Honor – Was there something in her letters that was biting or exceptional as opposed to merely complaining? Well, there was. There was accusations of all sorts of other employees engaging in deliberate indifference or gross incompetence. But it was not only the letter writing. But if you look in our brief, we have cited to the record – What if they were, in fact, grossly incompetent? I mean, she didn't call them jerks. She didn't use profanity. Well, I think that the stipulation was that all of these were made in good faith. The stipulation was true. We have to kind of start there. But I think if you look at – the letters are laced with insults. What is in the record other than the fact that people said, gee, we were really unhappy, we did not like her criticizing us? Because – A lot of people who said that said, gee, boy, this caused a lot of unhappiness around here. We were really demoralized that she would say stuff like that about us. But – There's a lot of evidence, Your Honor. She was a teacher at several different schools. Every single school except for one that she taught at, she had significant problems. And these were not people who she was criticizing. This was the principal at Franklin High School. You're saying who. You're not saying what. She said that – I can point to the point in our brief where – The one where they wanted to fight about the weight room? Exactly. You know, she says, you know, great, you buy the football team and all, the dance team, the extracurricular activities, you buy them equipment and then you put my federally mandated children out in the hall with the pot machines, basically. So, I mean, I could see you could differ as to what you should do, but why isn't that a legitimate exercise of the First Amendment rights about protection of these children under the federal law? That is legitimate. Well beyond that. More important, where's the disruption? I don't get it. I'll get to that. I – yeah. At Franklin High School – Why don't you just get to it? At Franklin High School, the principal testified that she spent so much of her time dealing with these concerns that she could not – it affected her ability to do her job. She said if – Maybe that just shows she's inefficient. Maybe that just shows – I mean, if you take the complaint to being good faith, to being good faith, why does the fact that the principal has spent a lot of time dealing with it, maybe she should have dealt with it more efficiently? Well, it – What – other than saying I really wish this woman would stop complaining, what was the principal there saying? The principal was saying if she had dealt in a professional, measured manner, that she would have got what she wanted. But instead what she started was in her office every day making complaints, criticizing everybody under the sun, that it affected the principal's ability to do her job. This wasn't the only school. This was only at one high school. At another high school, she had the pattern repeated. Well, of course she did because she had to go to all these different schools. In other words, that can't be an answer for why it's disruptive, because if she was only at one school, then presumably she would have concentrated her complaints there. I'm still having trouble – I mean, I don't think it's an easy question trying to figure out the clearly established, but the question I am trying to understand is, you know, it wasn't like she went to the school board or the newspaper. She tried to work her way up to her supervisor and then up that way, and that wasn't working too well. So then she started her letters. She didn't pick it? She didn't pick it out? What are you supposed to do, I guess? I think what you're supposed to do, and there's evidence that other teachers had complained about the problem. I mean, there's a funding shortage in the Portland Public Schools. Everybody knows that Doonesbury lampooned it, but what you're supposed to do is act in a professional manner and make criticisms in a professional manner, and that's what she did not do. But why isn't it professional? I mean, she writes the letters. She doesn't put them in the school newspaper or the Oregonian or anything like that. And the jury looked at this and says it's okay. The time, place, and manner was fine. They did not cause disruption. The jury actually was respectful of this and finds no disruption. Well, I think one thing you have to consider, Your Honor, is that the jury was infected by the misconduct of counsel, and the trial court has gone on a great length of talking about that. Was there an objection? There were objections throughout the trial, but there was not an objection during closing argument until the end in counsel. I thought that part of the ruling was really odd, really odd, bordering, bizarre, I really thought. There's more objections to most of this stuff. There seems to be almost a lot of stuff that struck me, you know, the question of whether it's 1,400 pages or 800 pages. I didn't quite get what that was about. And this business about saying opposing counsel scripted the witness. Well, what's wrong with that? Well, it went beyond that. Why is that a problem? They say, look, don't believe this witness. Look how she testified. She was scripted. Isn't that what lawyers argue to juries? Well, not when they point to opposing counsel and accuse them of providing a script to a witness. No, I think that goes beyond the pale. Why is that? First of all, what's wrong with providing a script to a witness? If the witness is telling the truth, don't you prep your witnesses for time? Do you prep your witnesses? Do you just sort of go in and ask them questions blindly? No. You try to ask questions on this. You know the answer. If you don't like the answer, you sort of say, well, you might say this. You might say that so long as you tell the truth, right? Come on, you do that. Everybody does that. Everybody prepares. But it's one thing to prepare and it's another thing to. What's wrong with saying, look, I listened to the way she talked. She was scripted. Because it went beyond just saying it was pointing and gesturing and saying and creating. Where is that prohibited? And then also in the transcript they talk about how every time somebody sneezed or pointed or gestured, the court wrote it down, but I didn't see it on those. Well, because the trial judge, I think you have to give some latitude, especially in issues of attorney misconduct to the district court. She heard the cumulative effect of all of this. What is the citation for this as well to tell the jury don't believe this witness because she's scripted? Where's the prohibition? Because with the district court. Where's the misconduct? If I say opposing counsel, they told the witness what to say. The witness, this is not real testimony. It's manufactured by the plaintiffs or the defendant's attorneys. That's in effect what. Obviously the lawyer is not saying I was a fly on the wall while they were prepping the witness. What he's saying is I know how these things go. You know, this is what lawyers do. You can infer from the way that this was testified that she was scripted, right? Well, he went beyond that and said counsel for the district got involved at an early stage and started manufacturing evidence. That was the implication that he left with the jury. But no objection. That's the problem. No objection? So what? The case law says that you don't have to object. It's a higher standard if you wait until after the jury is discharged. But the problem is if you object during the closing argument, it puts you in a very tough position as counsel because you're seen as perhaps blocking the jury from receiving information. You can ask for a sidebar. You can ask for a resource. This is all about adversarial legalism. And I still don't get it. What's wrong with saying, I mean, there was evidence that in fact counsel was involved early. Maybe not our counsel, but some counsel was involved. They got a lawyer involved early, and so they want to say look. They headed in for her, and so they got their lawyers in there, and they found a way to try to get her. I mean, I don't know if it's true or not. I'm just saying this is what a lawyer would argue. This is done directed by lawyers. What's wrong with that? What's wrong with asking the jury to infer that? Because there was no basis for the legal or factual basis for the argument. But he's not a prosecutor. Prosecutors may only ask questions if they have a legal or factual basis. Civil lawyers can ask jurors to infer. They can ask about all sorts of things they don't know about, or they can suggest to the jury that they draw inferences, even though they may be unsure whether that is a correct inference. You do that. Every trial lawyer, every civil trial lawyer does it. You don't know for a fact. You don't know for a fact the witness is lying, but you want to argue the jury. Look, this witness lied, and you ought to infer it because she stammered, because her palms were sweaty, and because her evidence was inconsistent. You don't know that she's lying, right, but you argue that. If you had to have a factual basis every time you asked a question of an adverse witness or argued to a jury, you'd never have a trial. That's correct. But these were not legitimate inferences. And when you accuse – I don't know. It sounded legitimate to me. Well, they didn't strike me as legitimate. They didn't strike the trial judge who heard them firsthand as legitimate. If I might, just on the Rehabilitation Act claim. It sounded to me like a Hail Mary pass, like the trial judge said, well, I don't know that these other things are going to fly, so I'm going to try this other thing. That's what it read like to me. I think that's not a very charitable description of the trial with a district court. It has to be charitable, the trial judge. Well, I think it was a very well-considered – she went into great length and great detail about – Do you know what the opposing counsel said about how she reacted to the newspaper accounts? That I don't – You heard the Breguet brief, right, where she first said, I heard what the jurors said about sending a message and I'm really upset about this. And then somebody told her, you better not base your ruling on that because you're not supposed to rely on outside evidence. Is that true, what the opposing counsel said? Your Honor, I don't know. That appeared for the first time in the reply brief, like many of their arguments. Did you check the reference? We're not – I did not check that reference. So you don't know that it's false? I can't say that it's false or true. Are you suggesting that counsel might have lied? I'm not making any suggestion whatsoever. Or inferences. Or inferences. May I have 30 seconds to speak to the Rehabilitation Act claim? There's been a lot of talk about McDonnell Douglas not applying in an FRCP 50 context. I would ask the Court to take a look at the Reeves v. Sanderson plumbing case. It's a U.S. Supreme Court. That's against you. It goes a long way. Well, but what it does say, though, is that the McDonnell Douglas framework, it does apply in a post-verdict motion. And it also says that the plaintiff has an obligation. It says this is at page 148 of 530 U.S. A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. So what it says is that the employer or the employee bears the burden of disproving the affirmative defense, if you will. And it also says in Reeves that the standard on a Rule 50 motion mirrors the summary judgment standard. Let's talk about that since you're taking a few more minutes. I read through the magistrate judge's ruling, and all she ever said, and all she ever presented evidence is, I mean, when I was sort of assuming you were right on the burden of proof, is that all they could show is that they could have non-renewed her based on her failure to write good IEPs, sufficient IEPs. Now, I have a little trouble with that because IEPs are a team process. Nobody writes an IEP. People draft IEPs and then present it to parents and to other teachers and to administrators and whatnot. So she might draft a little part of an IEP, but it would never be the ultimate IEP. It would have to be signed off by everyone. And I didn't see any evidence at all. I didn't see any reference from the district court's ruling of any evidence that but for her being a troublemaker, they wouldn't have renewed the contract. All she says is they could have. No, there is ample evidence. And first it comes in the context of the testimony of Susan Winthrop. And they will argue that she is an interested witness, and therefore you can't pay any stock in what she says. But you can look at the ‑‑ What did she say? She said that she testified that she ‑‑ there were three reasons, any of which would be sufficient to non‑renew her. One of those was the deficient IEP writing. I understand. There were reasons. But was there any evidence that anybody in Christendom has ever been denied, fired or denied a promotion or denied a renewal because they did bad IEPs? Writing bad IEPs is what teachers do. This is not nothing new. It's not, Your Honor. Was there any evidence that that was the actual reason or that anybody else had ever been non‑renewed or fired or disciplined for writing bad IEPs? Yes, there was evidence that it was the actual reason. Okay, but there's no evidence that anybody had ever been ‑‑ anybody else had ever been disciplined in any way for writing bad IEPs. I'm not aware of any, but that's not the school district's burden to show. You know, I read this opinion, and I thought that the district judge's decision there read like an advocate brief picking apart each IEP. And maybe that's, you know, I don't discredit that that's one way to look at it, but it seemed to me the testimony was basically in dispute on this issue as to the ultimate reason. One person said one thing, the jury could conclude something else. And what you have is the district court, in effect, trying to weigh the evidence and then trying to say, in her view, where it comes out the best, meaning, you know, where does the evidence land. And I just thought that that whole detailed dissection of the IEPs was evidence itself that you couldn't decide this on a Rule 50 motion. Well, as you know, she is entitled to weigh on the issue of a new trial. On the issue of a new trial. But where was the fact that there's an injustice? I mean, to me, that exactly, the fact that she went to such great lengths to try to undergird her decision seemed to me to simply just be another basis for us to say on review, you know, kind of where's the fire here. I'm having trouble understanding why this would be a miscarriage of justice. Based on what, I mean, I don't know the answer. I just know that there's awfully conflicting testimonies. I can offer something. I mean, I think the bottom line in all of these cases is that an employee should be no better or worse off for having engaged in protected conduct. Yeah, but you're past that. You're way past it because you have a jury finding not that she only engaged in protected conduct, but that she suffered retaliation. And you have to live with that. Okay? It is different if you have an employee who is being disciplined and she goes out and writes a newspaper article. You have a jury finding of retaliation. Okay? So now we are in retaliation land. The question is, is your client going to be able to get out from under after a jury, after a jury trial, properly instructed, or instructed without objection at least, finds retaliation? And that's a very different proposition from whether any employee at all can get out from under by claiming worst blowing or claiming first amendment activity. Here's what the district court says. This is on page 25 of the opinion. After reviewing all the evidence, this court concludes that the record conclusively reveals the legitimate non-discriminatory reason for the district decision not to renew the contract, namely plaintiff's inability to write APs. Okay? Okay. Where is the support for that? Where is the support that that was the actual reason? The support was in two places, at least two places. One, the testimony of Susan Winthrop. And if you bear with me, I can give you the site. It's in the supplemental excerpt of record. But two, it's in the ‑‑ because the appellant will say that you need to disregard that under Reeves. But it's also found in the evaluations themselves, the final evaluation, well before the lawsuit was ever brought, well before Susan Winthrop was a defendant. But after she wrote her letter to Canada. Yes, but that doesn't make her ‑‑ it was made at a time in the normal course and scope of her job. She said, cited all the reasons, all the problems, including IEPs, and that was first and foremost, and then said she will not be renewed. That is also in the record. Were the lawyers involved by then? Not Miller Nash, not outside counsel. I don't know what happened internally, but. I mean, I guess I'm having trouble understanding why the judge says that when at that point, first she has a, you know, I'm not saying it's the most glowing review as her counsel characterized it, but she has good reviews first year, then she gets this, but she's already written her letter. So it's pretty hard. I'm having trouble kind of attaining that, having written the letter. And again, it just seems to me that the district court's decision has to be there's really no evidence to support this verdict, and it would be a miscarriage of justice. So it just seems like such a high standard to me in the face of conflicting evidence. And you're saying, no, there's no conflicting evidence. That's correct, Your Honor. With respect to the IEPs, the evidence in the record is that she could not write adequate IEPs. There's testimonial evidence to that effect. Was there evidence that the stuff she wrote didn't actually get approved or that it got edited or that the parents rejected it? Was there evidence like that? Because, again, IEP is a team process. Nobody writes IEPs. Well, people do write different sections, even though for one specialized student, there may be different teachers. People draft sections, which then get passed around to the IEP team. I know a lot about this. It gets passed around to the IEP team, the parents, the homeroom teacher, special education teacher, the administrator, and they look at the goals and objectives and they look at the full IEP and they change them if they're not appropriate. Any evidence that in the process any of the things written by the plaintiffs were rejected, they had to be rewritten, they had to be redone, they couldn't be used? Any evidence like that? I'm trying to think back. The district court on page 15 dismisses it. It says, second, plaintiff reasons that if her IEPs were crucial for her, then they were equally crucial for her students. Thus, if they were inadequate, as Winthrop claims, the defendants would have produced evidence that they disregarded them or corrected them by calling another IEP meeting. It sounds like a good argument to me. The district court says this argument improperly attempts to shift the burden of persuasion on plaintiff defendants. I don't get it. Well, I think to answer back up there, there was testimony and evidence in the record that Susan Winthrop spent a lot of time working with Ms. Suttlegood to try to work on her IEP writing, gave her access to a bank of IEPs, gave her one-on-one instruction, and despite those efforts, she never approved. I expect that of a new employee learning a new skill, that you'll spend some time training them. But my question really was different. Is there any showing that the stuff she produced, you know, when I have a law class producer draft that's no good at all, it winds up in the trash can. I say, you know, let's try again. And then I can say, look, this didn't work. Was there any evidence that the stuff she produced didn't actually get used, didn't actually get incorporated into actual IEPs that were approved by the IEP team? Any evidence like that? Not to my knowledge, but the way the IEP teams work is she has final authority for drafting the IEP for adaptive physical education. There is no final authority. I've been in those meetings. Trust me. There is no IEP. Well, the point is that they're changed. And when the district comes up with the final IEP, it's pretty careful. And the reason is because it then has further legal responsibilities and obligations. So to the extent that they are unhappy with what she wrote, did they adopt it or not? Because under federal law, it then puts the district in a whole different ballgame. Once you've got the IEP in place, you're supposed to abide by it. And if you don't abide by it, then you're going to have another lawsuit. So it's not just sort of like a draft memo even that somebody rejects. It almost literally is a legally binding document. And if it's inadequate, if the thing is no good, you would expect to see instances of it being brought up. The only instance we have is where, I forgot the guy's name, changed one page by changing one item. And he took her language, left it in place, but changed one of the factors. So the language stayed the same. The draft looked the same, but he changed the substance of it. And his excuse was, well, I was working off her language. But again, if the school district is saying this is inadequate, you would expect they wouldn't put this thing out there to be bound by and to bind parents and to sort of discharge their responsibilities. No evidence of that, right? Well, I guess there are two issues on that. Number one is the district does not have the opportunity and the time to go through and correct every single IEP that's written by every single special ed teacher. But number two, it's not evidence that her IEPs were sufficient. But you're just guessing. In fact, these things are very carefully gone over. There are a series of meetings where people carefully go over the language of IEPs, parents, teachers, administrators, a whole group of people, there to make sure that the plan, the individual education plan for the student, is appropriate for the following year and creates these rights, which can then be enforced in federal court. I've never heard the school district sort of say, well, this is just government work. We'll just sign off on it even though it's not good. Anyway, I think we've gone enough into this. Thank you. All right. You kept a little time if you really want to pay me. I'm not going to address the substance of these remarks. I would just ask you to have your law clerks at ER look at ER 631. May we look at that, too? You may. Do we have to leave it up to the law clerk? Well, they can summarize it for you. It's actually real short. It doesn't need a summary. ER 705, 709, 710, and 684-85. Three times the magistrate judge considered things extraneous to the record to the case, but they really impacted her feeling about what the jury had done wrong. One was that you've already pointed out. Not to worry. You got it. You got it. Any chance this case could settle? We have a wonderful mediation office in London. We have a mediator. I think there was a mediator assigned to this case, and he concluded there wasn't any settlement. I don't know if you want to hear about it. No, we don't want to hear about it. It's already been through the mediation. It was scheduled, and then I think there actually was some phone conferences, and he said he sent it back to us. Never too late. You know, it's reasonably close to lunch. You know, you could go out to lunch with, of course, a counselor and sort of see whether there's any chance of settlement in light of, you know. I understand. If there is, you let us know in the next 24 hours, and we'll vacate submission and await. But only if counsel believes that there is a serious, possibly, settlement. And, again, we do have a mediator here who is very good, and our mediation office has had phenomenal success. So I recommend. There's a chance of having more than 24 hours. The trial team is in Hawaii trying the case right now, and the plaintiff's in Portland. I'm in Seattle. Okay. We'll give you a week. Thank you. We'll defer submission for a week, and if we don't hear either from counsel or from the mediator, if the counsel tells the mediator they will inform us internally, you don't need to worry about notifying us. But if we don't hear either way in a week, we'll order the case submitted and decided. Okay.
judges: D Nelson, Kozinski, McKeown